**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Robert E. Blackburn**

Criminal Case No.  04-cr-00224-REB
(Civil Case No. 06-cv-01975-REB-MJW)

UNITED STATES OF AMERICA,

      Plaintiff,

v.

1.  NATHAN ERIC SCANLON,

      Defendant-Movant.

# ORDER

**Blackburn, J.**

The matter is before me on remand from the Tenth Circuit Court of Appeals (No. 10-1135) (filed under seal June 22, 2010) to resolve one discrete issue of fact: whether counsel for the defendant-movant (Scanlon) "failed to appeal the sentence as requested." I received relevant evidence and argument on October 8, 2010.

Three witnesses testified: Scanlon, his mother, and his former attorney, Scott Varholak.[1] In assessing the credibility of those witnesses, I considered all facts and circumstances shown by the evidence that affected the credibility of each witness, including the following: the means of knowledge for each witness, his or her ability to observe, and his or her strength of memory; the manner in which each witness might be affected by the outcome of the hearing; the relationship each witness has to either side

---

[1] Scanlon testified first, followed by his mother, Ruth Larson, and Mr. Varholak. Ms. Larson did not hear the testimony of her son, and Mr. Varholak did not hear the testimony of Scanlon or his mother. Scanlon and his mother were called as witnesses by the attorney for Scanlon. Mr. Varholak was called by the government.

in the case; and the extent to which each witness was either supported or contradicted by other evidence presented during the hearing or previously by affidavit.

After observing and listening to each witness as each testified, I find Scott Varholak, the attorney who represented Scanlon at the time of his sentencing, to be the most credible. Unlike Scanlon and his mother, Mr. Varholak had no motive to spin the facts and was completely consistent throughout direct, cross-examination, and re-direct examination. Finally, unlike Scanlon, the testimony of Mr. Varholak was completely consistent with his affidavit that the government tethered to its response to Scanlon's § 2255 motion.[2]

From the evidence educed at the hearing on October 8, 2010, I find further as follows. Scanlon testified on direct examination by his attorney that shortly after his sentencing hearing, he had a brief conversation lasting two to five minutes with Mr. Varholak outside the courthouse. His mother, step-father, and girlfriend were present. Scanlon testified further that he told Mr. Varholak that he wanted to appeal his sentence and that he was clear that he wanted to appeal. Scanlon testified that Mr. Varholak told him in response that because the sentence was a guideline sentence, there was no point in appealing.

However, on cross-examination by the government, Scanlon testified somewhat inconsistently as follows:

Q  After Mr. Varholak told you that he didn't think there was a point in appealing,

---

[2] *See* [#63-1] Affidavit of Scott Varholak.

what was your reaction? What did you say?[3]

     A  I remember asking again if we could appeal. He said there's no point. At some point I basically said fine, and we went our separate ways. I got in the car with my family; he went back to the office. I figured I would call and speak with him after we had some time.

     Q  Okay. At no point in that conversation did you say, I don't care what you think, I want to file an appeal - is that right?

     A  I don't believe so, no.

Scanlon testified next on direct examination that approximately three or four days after the sentencing hearing, he called Mr. Varholak at his office. In a conversation that lasted about five minutes, Scanlon testified that he told Mr. Varholak that he would like to appeal his sentence:

     Q  What was your attorney's response to your second request for an appeal?

     A  It was much the same as the first. It was a guideline sentence. There's no point. I tried to bring up, I understand if there's no point, but I would like to appeal anyway and kept getting shut down at every turn.

On cross-examination about this second conversation, Scanlon testified less than puissantly or cogently that "I think I very expressly gave my desire to appeal."

Ms. Ruth Larson, the mother of Scanlon, testified next. On direct examination by counsel for Scanlon, Ms. Larson testified about the meeting that took place outside the courthouse shortly after the sentencing hearing.

     Q   And after the sentencing hearing, was there a conversation with your son and his attorney that you were part of?

     A  Yes.

---

[3] The excerpts of examination from the hearing are taken from the transcript, albeit not certified, of the hearing.

Q   When did that occur?

A   That was after we left the courthouse.  We were right outside.

Q   Right outside the courthouse building?

A   Yes.

Q   Who was present during that?

A   Oh, I believe it was Nathan, of course, myself, Scott Varholak, my husband, Larry Larson, and Nathan's girlfriend at the time, Beth Lambert.

Q   What was the nature of the conversation?

A   I don't recall the exact words, but it was something to the effect – Nathan asked if this could be appealed, and Scott Varholak said there wouldn't be any point.  I just said, "So we're done?  That's it?"  He said, yes.  He said he was sorry and we went our separate ways.

Q   When you say "he," who do you mean?

A   Scott Varholak.

Q   So the attorney said, there's no point and we're done?

A   Yes.

Q   What was the tone of that whole conversation?

A   Depressing.  He seemed almost as sad as we were.  I'm not sure if he expected the sentence to be what it ended up or not, but it didn't seem like it.

Q   Was -- were you surprised at what the sentence was?

A   Yes.

Q   Did you think it would be longer, shorter?

A   Shorter.

Q   And how long did you think this conversation lasted?

A   Maybe, at the outside, a couple of minutes.  It was pretty quick.

    Q  Was everyone talking at once?  Were people taking turns?

    A  It was – as I recall, Nathan talked, Scott Varholak, then myself.  That was about it.  I don't think Beth said anything.  I don't think my husband said anything.  Everybody was pretty, I guess, overwhelmed.

    Q  Now, at anytime did you hear your son say, "I don't want to appeal"?

    A  No.

    Q  I'm talking about the conversation right outside the courthouse.

    A  No.

    Q  Did he ever tell you that he didn't want to appeal?

    A  No.  In fact, he told me that he was going to try to call his attorney and talk to him about it again.

On cross-examination by the government, Ms Larson testified similarly:

    Q  Okay.  I want to talk about that.  Did you talk to your son about whether he should be in additional contact with his lawyer?

    A  He said he was going to try to call him, and I don't recall having talked to him other than that, except that he was just going to try contacting him again.

    Q  Did he indicate to you why he wanted to contact him again?

    A  To talk further about whether there's anything else that could be done.

    Q  Okay.  Did he ever indicate to you that Mr. Varholak was not following his instructions?

    A  I don't think he had any instructions to give.  I think he was asking for advice, not really giving instructions.  We didn't know what you could or couldn't do.  So he was asking, I think, more than telling, was my -- I guess that's my take on it.

    Q  He was asking more for advice about whether or not it made sense to appeal?

    A  Whether it could be appealed.

The testimony of Ms. Larson on both direct examination and cross-examination

was essentially consistent with the subsequent testimony of Mr. Varholak about the conversation that occurred shortly after the sentencing hearing.

Then, on re-direct examination, Ms. Larson testified somewhat differently, and certainly ambivalently, in response to obvious leading questions as follows:

    Q  Ms. Larson, was it clear to you your son was asking his attorney to appeal?

    A  Yes. He was asking if it was possible to appeal. I guess we really didn't know. We didn't know the process. So, yes, he was asking if it was possible to appeal and if he would appeal it.

    Q  Was it your understanding, from the conversation outside the courtroom, that – outside the courthouse -- that it was a request to appeal?

    A  Yes.

Ms. Larson was not privy to her son's subsequent telephone call to Mr. Varholak. Thus, neither Scanlon nor the government sought to educe evidence through her about that telephone conversation.

Mr Varholak testified last. He testified first about the conversation he had with the defendant following the sentencing hearing outside the courthouse. He recalled some of the details of that initial discussion and then rehearsed his custom and practice concerning requests to appeal. In response to questions by the government, Mr. Varholak testified cogently on direct examination as follows:

    Q  Okay. Let me back up to the conversation that took place outside the courthouse. At any time during that conversation did he say, "I want you to file a notice of appeal for me"?

    A  No.

    Q  So you've said this is six years ago. I can remember some. What are you very clear about with that conversation?

  A I am very clear that Mr. Scanlon never instructed me to file an appeal on his behalf.  Had Mr. Scanlon instructed me to file an appeal on his behalf, I absolutely would have.  I have a sheet, a two-page spreadsheet that I keep every single active 04 case that I have with date deadlines in the spreadsheet and things to do.  In any case where I'm instructed to appeal, I will put down the time line for filing that appeal and the defendant wants the appeal file.  I update that sheet at the end of every day or unless I'm at prison almost everyday.  Had he told me he wanted to file an appeal, I would have filed it.  I've filed it in cases where I didn't think we would have an appeal but the defendants wanted an appeal.  Had he instructed me, I would have absolutely filed the appeal.

  Q You've had cases before where defendants have said I want you to appeal even though you don't think there's a chance of success.  They want you to file an appeal on their behalf?

  A Absolutely.  I'll normally discuss at that meeting that I don't think an appeal is going to be legitimate.  I'll go through the reasons why, but if they say, "I don't care;  I want an appeal filed," I'll absolutely file an appeal.  I've done it before.  I've filed Anders briefs in cases like that.

  Q At the conclusion of this conversation that occurred outside the courthouse, how did that conversation end?

  A My recollection was at the end of that we were all very tired.  It was a long day.  We were all disappointed.  My recollection of it was, I said, look, I don't think we have any grounds for an appeal.  He said if we don't have any grounds for an appeal, then there's no point in pursuing it.  Then I think what happened is I said, look.  It's been a long day.  Why don't we – why don't you go back home, why don't I sleep on it over the weekend.  I may have said – because I do this sometimes – let me talk to people in my office and see what they think of it and let's touch base again next week and make sure that neither of us has changed our minds.  I can't recall that's exactly what happened, but that's how I remember it.  In cases like this where it's been a contentious hearing, where I don't think we've got grounds for an appeal, but the sentence is lengthy and, frankly, I'm frustrated by the sentence, I will sometimes do that.  I'll say, look.  I don't think we have grounds.  We'll reach a conclusion at the end of that day.
Then I'll say, let's talk about it next week or if it's at the jail I'll come out and see you next week and make sure.  I think that's what happened.

  Q But you're absolutely clear at no point in that conversation did Mr. Scanlon say, "I want to appeal"?

  A That's correct.

  Mr Varholak concluded his direct examination by testifying as follows:

7

     Q   Okay. In your affidavit you discussed that you informed Mr. Scanlon he had the right to appeal and, if requested, you would file the appeal on his behalf. Did you discuss that?

     A   Yes.

     Q   What was Mr. Scanlon's response?

     A   It was – again, I don't remember the exact words. It was, if you don't think we've got a good shot at an appeal, then we won't file the appeal.

The ensuing testimony of Mr. Varholak on cross-examination by counsel for Scanlon and re-direct examination by the government was entirely consistent with his testimony on direct examination. For example, on cross-examination Mr. Varholak testified further about his conversation with Scanlon immediately following the sentencing hearing:

     Q   Since we're here you're aware Mr. Scanlon doesn't agree with requesting the appeal or not, correct?

     A   I'm not certain. I think his affidavit is somewhat unclear as to whether or not he said that he instructed me to appeal and I didn't and failed to do so or whether I gave bad advice and I shouldn't appeal. I haven't been in the first part of the proceedings. I didn't hear him testify.

     Q   Okay. You met with Mr. Scanlon and the family outside the courthouse immediately following the sentencing?

     A   I definitely met with Mr. Scanlon. I think his mother was there also, but – I know she was there. I don't recall whether she was with us when we were talking or not, but she may have been. I don't recall.

     Q   And during that conversation, albeit brief, there was discussion about the appeal?

     A   Yes. I don't think it was that brief. It was five to ten minutes long. Yes. There was discussion about the appeal.

     Q   And you didn't have – you weren't taking any notes during that conversation?

     A   No.

Q   This was six years ago, as you said?

A   Correct.

Q   And I notice that during your direct testimony you frequently said, I recall and – or I think or that was my recollection.

A   That's correct.  It was six years ago.  I can't sit here and say I remember every single word that was used in either of these conversations because I can't.

Q   Okay.  Now, it's common for people who get sentenced to longer than they anticipate to want to appeal, correct?

A   It is.

Q   And you did have two conversations with Mr. Scanlon regarding the appeal?

A   Correct.

Q   And you didn't file an appeal; is that correct?

A   Correct.

Q   And I think you said you don't believe you had a conversation with Ms. Larson regarding this – or you weren't sure?

A   Again, I think she may have been in that first meeting that we had.  So, yes.  She may have been.  I don't recall.  I know she was outside the courthouse.  What I can't recall is whether Mr. Scanlon and I moved separately over to one area or whether – or whether she was with us.  I don't remember exactly.

Q   Okay.  And since you can't remember exactly the whole setup there, it's possible that Mr. Scanlon asked you to appeal?

A   No.

Q   You're certain of that?

A   I'm certain of that.

Similarly and consistently, Mr. Varholak testified in relevant part on re-direct examination by the government as follows:

Q   And you got some questions there at the end from Ms. Barnicle about – this

9

conversation happened some years ago.  If you could please tell the Court exactly what you are clear on as to whether or not you were instructed to file a notice of appeal despite your advice it was not meritorious.

      A   I'm absolutely certain I was not instructed to file a notice of appeal.  If I am ever instructed in any case that I've ever had to file a notice of appeal, if I have any question whether or not I need to file a notice of appeal, I file a notice of appeal.  It is an absolute right that the defendant has.  They don't have many.  One of them is plead or go to trial.  Second is jury or no.  The third is to appeal or not.  If he instructed me to file an appeal, even if I thought it was completely frivolous, I would have filed the appeal.  How our office works is we can either handle our own appeal if we choose or we have research and writing attorneys associated with the appellate division of your office.  If it's an issue that I've worked all the way through, generally an objection to a guideline issue and an appeal I want to do, I would do it myself.  If there's something I don't think there is a legitimate issue, I'll perfect the appeal, file it with the documentation and additional records and walk it to the appellate wing and ask the research and writing attorney to do the appeal, frankly, to have hem get a look at it to see if there's anything there that's anything other than an Anders brief.  Had he instructed me, what I would have done is filed the notice of appeal.  I would have perfected it with the docketing statement and the other documents you need to, and then I would have walked it down to one of ow research and writing attorneys prior to that point prior to the opening
brief and said, here's the file.  Can you see if there's anything here other than an Anders brief in this case.

I find ultimately that Scanlon never requested or directed his attorney, Scott

Varholak, to file a notice of appeal.

**THEREFORE, IT IS ORDERED** as follows:

1. That the **Order Adopting Recommendation of United States Magistrate**

**Judge** [#70][4] entered February 2, 2010, is **AMENDED** and **SUPPLEMENTED** to include

the finding of fact that the defendant-movant did not direct his attorney to file a notice of

appeal following his sentencing hearing on May 27, 2005; and

---

[4] "[#70]" is an example of the convention I use to identify the docket number assigned to a specific paper by the court's case management and electronic case filing system (CM/ECF). I use this convention throughout this order.

2. That the defendant-movant's **Motion To Vacate, Set Aside, Or Correct Sentence Pursuant to 28 U.S.C. § 2255** [#53] filed April 28, 2006, is **DENIED**.[5]

Dated January 26, 2011, at Denver, Colorado.

**BY THE COURT:**

Robert E. Blackburn
United States District Judge

---

[5] See **U.S. v. Scanlon**, **Order and Judgment** at 8 (No. 10-1135) (10th Cir. June 22, 2010) (sealed document) ("If however, the district court finds that Scanlon did not direct trial counsel to file a notice of appeal, Scanlon's request for § 2255 relief must be denied.")